# 23-1041-CV

IN THE

United States Court of Appeals
FOR THE SECOND CIRCUIT

Rhuland Davis,

*Plaintiff-Appellant*

*v.*

Metro North Commuter Railroad, Andrew Paul, Vice President Labor Relations, in his official
and personal capacity, John Longobardi, Deputy Chief Field Operations, in his official and
personal capacity,

*Defendants-Appellees.*

*On Appeal from the United States District Court
for the Southern District of New York*

## APPELLANT'S BRIEF

Joshua Alexander Bernstein, Esq.
Josh Bernstein P.C.
*Attorneys for Plaintiff-Appellant*
188 Grand Street, 2nd Fl.
New York, NY 10013
(646) 308-1515

Jennifer Mustes, Esq.
Metro-North Commuter Railroad
*Attorney for Defendants-Appellees*
420 Lexington Avenue
New York, NY 10170
(212) 340-2504

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**      i

**JURISDICTIONAL STATEMENT**      1

**ISSUES PRESENTED**      2

**STATEMENT OF THE CASE**      3

    **Statement of Facts**      4

        **Mr. Davis Works his Way Up Through the Ranks
and Successfully Discharges His Duties
for Over Two Decades**      4

        **The Engineer Operating Mr. Davis's Train
Causes a Collision**      4

        **Defendants Bizarrely Speculate That There was
Some Sort of "Cover-Up"
and Decide to Terminate Mr. Davis
Before an Investigation is Conducted**      6

**SUMMARY OF ARGUMENT**      7

**ARGUMENT**      8

    **The Applicable Legal Standard**      8

    **Plaintiff's Burden is Merely to Articulate a "Plausible" Claim**      9

    **The Court is Limited to the Pleadings on a Motion to Dismiss**      9

    **Judge Ramos's Improper Reliance on Defendants' 10+ Exhibits
Extrinsic to the Complaint on a 12(b)(6) Motion to Dismiss**      9

    **Application of the Legal Standard to Plaintiff's Pleadings**      13

**A Predetermined Show Trial**
**Cannot Satisfy Procedural Due Process**                          13

**Blocking the Opportunity to Cross-Examine Witnesses**
**is a Fundamental Violation of Due Process**                      17

**Selective Enforcement**                                          18

**Facially Disparate Treatment**
**Establishes Selective Enforcement**                              20

  Defendants Offered a Waiver to the Engineer
  Who Took Full Responsibility,
  While Refusing to Even Hold
  the Mandatory Pre-Trial Conciliation Meeting
  With Mr. Davis's Representatives                         20

  Defendants Treated Other Employees Involved
  in Collisions Much More Leniently than Mr. Davis        22

  Defendants' Treatment of Other Conductors
  Demonstrates Disproportional Discipline                 24

**Title VII**                                                      26

  Defendants' Deviation from Procedural Regularity
  Creates an Inference of Discrimination                  27

  Terminating a Loyal Employee's 25-year Career
  for a Collision A Co-worker Took Responsibility For
  Is Wildly Disproportionate Punishment                   29

**CONCLUSION**                                                     33

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Almodovar v. Cross Fin. Corp.*, No. 20-CV-01179,
2022 U.S. Dist. Lexis 98413 (D. Conn. June 2, 2022)               25

*Artec Constr. & Dev. Corp. v. City of New York*,
No. 15 Civ. 9494 (KPF), 2017 WL 5891817 (S.D.N.Y. Nov. 28, 2017)   17

*Barrows v. Burwell*, 777 F.3d 106 (2d Cir. 2015)                  11

*Bizzaro v. Miranda*, 394 F.3d. 82 (2d Cir. 2005)                  17

*DiBlasio v. Novello*, 344 F.3d 292, (2d Cir. 2003)                13

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129 (2d Cir. 2000)     24

*Ciambriello v. Cnty. of Nassau*, 292 F.3d 307 (2d Cir. 2002)      11

*Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778 (2d Cir. 2007) 16-7

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)        11

*Concrete Pipe & Products of California, Inc. v.
Construction Laborers Pension Trust for Southern California*,
508 U.S. 602 (1993)                                                13

*Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, No. 08 Civ. 11031,
2011 U.S. Dist. Lexis 172790 (S.D.N.Y. March 30, 2011)             26

*Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.*,
No. 02 Civ. 9151, 2008 U.S. Dist. Lexis 58040 (S.D.N.Y. July 31, 2008)  27

*Elias v. Rolling Stone LLC*, 872 F.3d 97 (2d Cir. 2017)           6

*Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680 (S.D.N.Y. 2004)  17

*Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000)           17

*Gullo v. Califano*, 609 F.2d 649 (2d Cir. 1979) — 16

*Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62 (2d Cir. 2001) — 24

*Johnson v. Connecticut,* 798 F.Supp.2d 379 (D. Conn. 2011) — 26

*Locurto v. Safir*, 264 F.3d 154 (2d Cir. 2001) — 11-14

*Lyle/Carlstrom Assocs. v. Manhattan Store Interiors*, No. 85-4347, 1986 U.S. Dist. Lexis 26490 (E.D.N.Y. April 21, 1986) — 7

*Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679 (S.D.N.Y 2011) — 17, 21

*Norris v. Metro North Commuter R.R. Co.*, 522 F.Supp.2d 402 (D. Conn. 2007) — 25-26

*Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95 (2d Cir. 2022) — 1

*Palin v. New York Times Co.,* 940 F.3d 804 (2d Cir. 2019) — 7

*Richard v. Calvet*, No. 99 Civ. 12172, 2005 U.S. Dist. Lexis 5365 (S.D.N.Y. Mar. 31, 2005) — 26-27

*Richards v. N.Y.C. Bd. Of Educ.,* 668 F.Supp. 259 (S.D.N.Y. 1987) — 26

*Rosario v. Town of Mount Kisco*, No. 16 Civ. 8766 (NSR), 2018 WL 2209487 (S.D.N.Y. May 11, 2018) — 18

*Rothenberg v. Daus*, 481 Fed.Appx. 667 (2d Cir. 2012) — 13

*Sklaver v. Casso-Solar Corp.*, No. 02-CV-9928, 2004 WL 1381264 (S.D.N.Y. 2004) — 25

*Smith v. North Shore*, 286 F.Supp.3d 501 (E.D.N.Y. 2018) — 30

*Stalter v. Walmart Stores*, 195 F.3d 285 (7th Cir. 1999) — 30

*Stern v. Trustees of Columbia University in City of New York*,
131 F.3d 305 (2d Cir. 1997)                                              25

*Stratton v. Dep't for the Aging for N.Y.C.*, 132 F.3d 869 (2d Cir. 1997)   24-25

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981)        24

*Townley v. Heckler*, 748 F.2d 109 (2d Cir. 1984)                        16

*Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005)                              13-14

*Victory v. Pataki*, 814 F.3d 47 (2d Cir. 2016)                          15

*Ward v. Village of Monroeville*, 409 U.S. 57 (1972)                     13

**Statutes**

FRCP § 8                                                                  6

## <u>JURISDICTIONAL STATEMENT</u>

Plaintiff-Appellant Rhuland Davis ("Plaintiff", "Mr. Davis", or "Appellant") initiated this action against Appellee-Defendants Metro North Commuter Railroad, Andrew Paul, and John Longobardi ("Defendants" or "Appellees") to remedy a wrongful termination in violation of the 14th Amendment and/or 42 U.S.C. § 1983 (procedural due process and selective enforcement), and in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*.

The District Court, J. Edgardo Ramos, had jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331. Final judgment dismissing Plaintiffs' claims for failure to state a claim pursuant to FRCP § 12(b)(6) was entered on June 20, 2023.

Plaintiff filed a timely Notice of Appeal on July 18, 2023. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## <u>ISSUES PRESENTED</u>

In this single-Plaintiff employment suit, Mr. Davis plead that Defendants decided to terminate his employment before any investigation or hearing was actually conducted; that he was deprived of the ability to cross-examine witnesses whose statements had been admitted into evidence against him; and that non-Black comparators were treated more leniently and not fired for similar (or worse) alleged conduct.

1. **Can due process for government employees be satisfied by a disciplinary process that is just for show, with a preordained outcome?**

2. **Is the right to cross-examine witnesses no longer an essential element of due process?**

3. **Was dismissal of the Second Amended Complaint proper?**

## <u>STATEMENT OF THE CASE</u>

This is a single-plaintiff suit for wrongful termination in violation of the 14th Amendment and/or 42 U.S.C. § 1983 (procedural due process and selective enforcement), and in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*. A26-7.

Mr. Davis initially filed suit pro se on January 11, 2021. A1. Defendants moved to dismiss on June 30, 2021. A3. Mr. Davis, still pro se, amended as of right on September 29, 2021. Defendants moved to partially dismiss the Amended Complaint on October 21, 2021. The case was reassigned to Judge Edgardo Ramos on December 10, 2021. A4. J. Ramos denied Defendants' first motion to dismiss as moot on January 6, 2022. Mr. Davis retained counsel, and counsel for Mr. Davis filed a Notice of Appearance on April 15, 2022. A5. Judge Ramos granted Defendants' second motion to dismiss on June 21, 2022, with leave for Mr. Davis to amend his Section 1983 and Due Process claims, while dismissing the individual defendants. A6. Mr. Davis filed the Second Amended Complaint on August 19, 2022. A7. Defendants moved to dismiss the Second Amended Complaint on October 6, 2022. A8. Judge Ramos granted Defendants' motion with prejudice on June 20, 2023. Mr. Davis filed a Notice of Appeal on July 18, 2023. A10.

The standard of review on a motion to dismiss is de novo. *Noto v. 22nd Century Grp., Inc.*, 35 F.4[th] 95, 102 (2d Cir. 2022).

**Statement of Facts**

**Mr. Davis Works his Way Up Through the Ranks
and Successfully Discharges His Duties for Over Two Decades**

Mr. Davis began working for Metro North Commuter Railroad ("Metro North") in 1991 as a coach cleaner. He worked his way up to Carman Helper, then Electrician, before becoming a Train Conductor in 1996. Mr. Davis remained a Train Conductor from that time until his termination 22 years later. Second Amended Complaint ("SAC") ¶ 9-10, A13.

**The Engineer Operating Mr. Davis's Train Causes a Collision**

On July 12, 2018, Mr. Davis was assigned to the AM Protect ("AMMO") crew on the New Haven Line, with a brakeman and engineer, to stay on standby during the morning rush hour to protect the main line track in case a train broke down and needed to be towed off the track. After the morning rush hour, the AMMO crew stopped at a freight yard to pick up six additional freight cars before going up the New Haven line. Id. ¶ 13, A14.

The AMMO train approached a curve bend in the track. But because Mr. Davis was on the "fireman's" side of the cab following the outside curvature of the track, his line of sight was completely obstructed by the engine, and he temporarily lost sight of what was ahead on the track. The engineer's side of the cab, however, followed the inside curvature of the track, and he maintained his full field of vision of the track ahead.  Id. ¶ 16, A14.

Prior to approaching the curve bend, the engineer saw another train ("Train 1924") some distance ahead, but at that point, was unable to discern whether the train was on a parallel track or the same track as the AMMO train. As the engine car took the curve bend, he realized the other train was on the same track and immediately applied the emergency brakes to avoid hitting it. The train was travelling at below restricted speed—at approximately 13 mph— when the engineer applied the emergency brake. Id. ¶ 17, A15.

Because Mr. Davis's line of sight was obstructed, he did not know what caused the engineer to apply the emergency brake. Approximately a second before contact, Mr. Davis saw Train 1924 as their engine car collided with it. As a result of the collision, the knuckles of the two trains became hitched together. Id. ¶ 18, A15.

A crewmember of Train 1924 immediately made an emergency call to District F Rail Traffic Control ("RTC"). As he exited the engine compartment, Mr. Davis heard RTC over his handheld radio initiate the emergency call protocol. Id. ¶ 19, A15.

Mr. Davis saw that their engine car and Train 1924 were hitched to each other, and based on his experience as Conductor, he concluded the trains need to be unhitched and immediately went down to the track to physically detach the connected knuckles of his engine car from Train 1924. Id. ¶ 20, A15.

Mr. Davis was taken out of service effective immediately, and about a week later received a notice of disciplinary hearing from Metro North outlining his charged offenses: failure to take appropriate action to stop the train within one-half the range of vision (restricted speed protocol) of Train 1924, failure to call in the incident to RTC, failure to carry his Conductor license, and performance of an unauthorized reverse move. Id. ¶ 21, A15.

**Defendants Bizarrely Speculate That There was Some Sort of "Cover-Up" and Decide to Terminate Mr. Davis Before an Investigation is Conducted**

The day of the collision, Metro North Vice President Andrew Paul announced to Mr. Davis's union representatives that Mr. Davis would be fired. This determination was made before the facts were known and any investigation had been conducted. Id. ¶ 31, A18.

Unbeknownst to Mr. Davis, Defendants immediately jumped to the conclusion that there was some sort of cover-up of this incident because the engineer, brakeman, and Mr. Davis promptly unhitched the two trains. A84. Defendants' Director of Employee & Labor Relations opined that: "It does sound like we have three terminations on our hands". Id.

Four days later, Defendants' Superintendent of the New Haven Line drafted a set of charges for the engineer, brakeman, and the conductor (Mr. Davis). The Superintendent drafted a proposed set of charges for the whole crew, a second alternative set of charges for the engineer and conductor (Mr. Davis) only, and a

third alternate charge for Mr. Davis alone for failing to have his conductor card on his person at the time of the collision. A86-7.

The following day, Andrew Paul wrote that due to "some serious disciplinary marks on their record", Mr. Davis and the engineer (Craig Davis, no relation) would likely be terminated. A89. But over the following month, the "serious disciplinary marks" of the engineer were recharacterized as a "fine" record since getting into a physical fight with a coworker "about 10 years back" – which was not even accurate, as the engineer did not have a clean record since the referenced fistfight – and Defendants decided to "fast track" Mr. Davis's hearing "with an eye towards termination" before the underlying facts had been established in the departmental investigation. A91. Mr. Davis was then terminated as of October 9, 2018. SAC ¶ 3, A12.

## SUMMARY OF ARGUMENT

Defendants decided to fire Plaintiff Rhuland Davis and end his 25-year career before any investigation was conducted into the train collision that ostensibly motivated his termination, while subverting the disciplinary process against Mr. Davis from the outset. Despite that the Collective Bargaining Agreement requires Defendants to hold a conciliation meeting prior to any administrative trial for the purposes of settlement, and to conduct any investigation within a week of when an employee receives notice that charges are being brought

against them, Defendants refused to meet with Mr. Davis's representatives and delayed the investigation for over a month-and-a-half. In the interim, while Mr. Davis was on unpaid suspension, he posted a picture on social media of himself on a boat, which Defendants evidently saw and considered a "huge middle finger" to them. When the investigation was finally held, Defendants intervened in the administrative trial to deprive Mr. Davis's representatives of the ability to cross-examine the witnesses brought against him. Defendants singled-out Mr. Davis for a termination that was a fait accompli before the facts even came out, and then ignored the exculpatory evidence that came to light en route to the foregone conclusion of ending Mr. Davis's decades-long career in ignominious fashion.

## **ARGUMENT**

### **The Applicable Legal Standard**

#### **On a Motion to Dismiss Pursuant to FRCP § 12(b)(6)**
#### **All Inferences Must be Drawn in the Non-Moving Party's Favor**

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP § 8(a)(2). In deciding whether plaintiffs have met this minimal burden when adjudicating a motion to dismiss under Rule 12(b)(6), the Court assumes the truth of the pleadings and is required to draw all inferences in favor of the plaintiffs. *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (citations omitted).

### Plaintiff's Burden is Merely to Articulate a "Plausible" Claim

The Supreme Court has made clear that plaintiffs satisfy their pleading

burden when the complaint states a "plausible" claim:

> "The pleading standards articulated in *Bell Atlantic Corp. v. Twombly*,
> 550 U.S. 554, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) and *Ashcroft
> v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) are
> well-known: in order to satisfy Federal Rule of Civil Procedure 8, a
> complaint must contain 'enough facts to state a claim to relief that is
> plausible on its face.' A claim is plausible 'when the plaintiff pleads
> factual content that allows the court to draw the reasonable inference
> that the defendant is liable for the misconduct alleged.'"

*Palin v. New York Times Co.,* 940 F.3d 804, 810 (2d Cir. 2019) (citations omitted).

### The Court is Limited to the Pleadings on a Motion to Dismiss

"[A] motion to dismiss for failure to state a claim upon which relief can be

granted is addressed to the face of the pleading and in this Circuit, the Court may

look only within the four corners of the Complaint or any other statement attached

as an exhibit or clearly incorporated by reference." *Lyle/Carlstrom Assocs. v.

Manhattan Store Interiors*, No. 85-4347, 1986 U.S. Dist. Lexis 26490 * 2

(E.D.N.Y. April 21, 1986) (citation omitted)

### Judge Ramos's Improper Reliance on Defendants' 10+ Exhibits Extrinsic to the Complaint on a 12(b)(6) Motion to Dismiss

By the time Defendants' Motion to Dismiss the Second Amended Complaint

was being briefed, substantial discovery had occurred. Accordingly, in the

Opposition papers, counsel for Plaintiff annexed a number of probative exhibits

9

and asked the Court to convert the motion into one for summary judgement, and to hold that motion in abeyance pending the completion of discovery.

Judge Ramos denied this request, holding that the documents annexed to Mr. Davis's Opposition were incorporated by reference into the Second Amended Complaint, and would be properly considered on a motion to dismiss. A111-113. Ostensibly, that branch of Judge Ramos's decision only concerned the documents Mr. Davis annexed to his Opposition, but in reality, Judge Ramos used it to rely heavily on documents annexed to Defendants' motion that were clearly beyond the pleadings.

Most troublingly, Judge Ramos relied on a text message annexed to Defendants' Declaration in Support to controvert Mr. Davis's explicit pleading that he was not ever actually offered a settlement/waiver of the charges against him, and then turned around and held that every single comparator Mr. Davis identified was not similarly situated because they accepted a waiver. Mr. Davis's pleadings on the issue make clear there is a dispute of fact:

> "44. ***Mr. Davis was never actually offered a settlement or waiver in connection with the July 12, 2018 incident, unlike the other two employees on the train in question,*** including the engineer who took full responsibility for the collision.

> 45. ***At Metro North, settlements and waiver offers are made formally in writing.*** While the other two employees on the train in question were provided with formal settlement offers in writing (and long before the investigation was conducted), Mr. Davis was never provided with an actual settlement offer, not to mention formally and in writing.

46. After the investigation was conducted, Mr. Davis's union representative informed him that they had heard Defendants were going to fire Mr. Davis unless he admitted guilt and forfeited any right to appeal. Mr. Davis's union representative granted Defendants an extension on their time to make a decision as to Mr. Davis's fate, and sought to meet with Defendants' President to see if there was a deal to be made. ***While Mr. Davis maintained his innocence and did not want to sign an admission of guilt, the settlement/waiver never actually materialized, and Defendants never actually made a settlement/waiver offer to Mr. Davis.*** It does not appear that Mr. Davis's union representative was ever actually able to meet with Defendants' President to discuss a deal post-investigation, and that the union representative's understanding of what actions Defendants were going to take absent an admission of guilt and forfeiture of a right were merely second-hand musings from an unidentified employee who did not possess the authority to actually enter into a settlement agreement or offer a waiver." (emphasis added) A21-22.

Instead of taking these pleadings at face value, Judge Ramos relied on a text

message annexed to Defendants' Declaration in Support for the proposition that:

"On September 26, 2018, Davis was informed that Metro-North would not

terminate his employment as long as he signed 'an admission of guilt waiver' and

forfeited his right to an appeal'", citing to Doc. 65-8 at 2, which is Exhibit H to

Defendants' Declaration in Support. A62-3, A105. Judge Ramos then cited to ¶ 46

above for the proposition that Mr. Davis rejected this offer, when the pleading

makes explicit that these were merely second-hand musings from an unidentified

employee; the waiver offer never actually materialized; and Mr. Davis's union

representatives were never actually able to meet with Defendants' president to

discuss a deal. Indeed, even the text message itself makes clear that Mr. Davis's

11

union reps gave an extension of time to Defendants to decide what they wanted to do, and: "Ralph wants to see the President about the offer", which meeting never occurred. A63.

Indeed, the pleadings are explicit that Dennis Richardson (the union representative who authored the text message referenced above) explained: "They did not treat you the same as other employees involved or as they treat any employee. ***They prejudged you and never offered a settlement as they did in other cases.***" (emphasis added) A18, ¶ 31. Judge Ramos not only relied on exhibits beyond the four corners of the Complaint but went so far as to simply ignore Mr. Davis's explicit pleadings on this precise issue, instead substituting Defendants' contentions as if there were no dispute of fact.

This is a consistent pattern in Judge Ramos's decision, citing time and time again to exhibits extrinsic to the pleading annexed to Defendants' motion papers. Defendants' Declaration in Support is document No. 65, and all of Defendants' exhibits are annexed to that declaration. Judge Ramos improperly cited to Defendants' declaration and the annexed exhibits no less than sixteen times in his decision. *See* A103-5, A111-3, A116, A119, A123-4. This is fundamental error that must be overturned.

### Application of the Legal Standard to Plaintiff's Pleadings

**A Predetermined Show Trial Cannot Satisfy Procedural Due Process**

To state a claim alleging a deprivation of procedural due process, a plaintiff must (1) identify "a protected interest in property or liberty"; (2) establish that the state deprived plaintiff of that right; and (3) show that the deprivation occurred without due process of law. *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015). A public employee has a property interest in continued employment if the employee is guaranteed continued employment absent just cause for discharge. *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002). It is undisputed that this is the case here.

A public employee is entitled to a notice and a limited opportunity to be heard prior to termination. *Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–46 (1985)). The notice, either oral or written, must include the "charges against [the employee], an explanation of the employer's evidence, and an opportunity to present [the employee's] side of the story." *Loudermill*, 470 U.S. at 546. The requirement of a hearing does not require a neutral decisionmaker if the plaintiff is provided a full opportunity to dispute the outcome of the hearing in a post-deprivation hearing before a state court judge in an Article 78 proceeding. *Locurto*, 264 F.3d at 173–74.

In dismissing Mr. Davis's due process cause of action, Judge Ramos stretched this principle beyond its breaking point, holding that because the decisionmaker need not be "neutral", the decision could have actually been made before the hearing was even conducted. This holding breaks new ground, as no Court in this Circuit has ever held that a farcical going-through-the-motions hearing with a predetermined outcome could satisfy due process.

Mr. Davis explicitly plead that Defendants singled him out for termination before the underlying facts had been determined. The day of the train collision, Metro North Vice President Andrew Paul announced to Mr. Davis's union representatives that they would be firing Mr. Davis. As the representative relayed to Mr. Davis: "'This was before the facts were known and before the investigation. They did not treat you the same as the other employees involved or as they treat any employee. They prejudged you and never offered a settlement as they did in other cases'". SAC ¶ 31, A18; *see also* A91.

In *Locurto,* the Second Circuit held that the decisionmaker in a pre-deprivation hearing need not be neutral so long as subsequent to termination, plaintiff was provided a full adversarial hearing before a neutral adjudicator in the form of a state court judge in an Article 78 proceeding. *Locurto, supra* at 174. In that case, the plaintiffs – firefighters and police officers - were fired for riding on racist parade float involving blackface and attending a similarly racist afterparty.

Then-mayor Giuliani caught wind of the incident and made a public statement that plaintiffs would be fired. Plaintiffs argued that because of this statement, the City Police Department's Deputy Commissioner for Trials should have been recused from presiding over their disciplinary proceeding, and constituted a violation of procedural due process. The Second Circuit held that because the plaintiffs had an opportunity to challenge their termination in a subsequent Article 78 proceeding, this post-deprivation neutral hearing rendered moot any less-than-neutral departmental hearing.

The Second Circuit has itself questioned the viability of *Locurto* in light of the Supreme Court's decisions in *Ward v. Village of Monroeville*, 409 U.S. 57, 61-62 (1972) and *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602 (1993), directing the district court to further develop the record and re-evaluate whether there was unconstitutional bias in the prior proceeding and whether any such bias was cured by the availability of Article 78 proceedings. *Rothenberg v. Daus*, 481 Fed.Appx. 667, 677 (2d Cir. 2012). The Second Circuit has also made clear that *Locurto* does not undermine the holding in *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) and the long line of authority preceding it; that post-deprivation remedies available to a plaintiff are inadequate where "the government actor in question is a

high ranking official with final authority over significant matters." *Velez v. Levy*, 401 F.3d 75 fn 16 (2d Cir. 2005).

Even if there is no requirement that the pre-deprivation decisionmaker be neutral, there is a massive gulf between a lack of neutrality and *the outcome of the hearing being determined before it is even held*. Even if the decisionmaker is not required to be neutral, the Second Circuit has certainly never gone so far as to say that pre-deprivation due process can be satisfied by political theatre. Indeed, in *Locurto*, the Second Circuit made clear that at the Article 78 proceeding, the plaintiffs would have an opportunity to raise claims that the prior adjudicator was biased and prejudged the outcome, *Locurto supra* at 174-5, but at the arbitration, the only consideration of the arbitrator was whether there existed cause to terminate Mr. Davis's employment. *See* A79-80.

Mr. Davis did not have recourse to an Article 78 proceeding, a state court proceeding with all the concomitant formal procedures, evidentiary rules, and due process guarantees. Instead, he was limited to challenging his termination before an arbitrator who was over 90 years old, mentally infirm, and incapable of performing the duties of his position. SAC ¶ 26, A17. Indeed, Metro North and the relevant union decided to stop using this arbitrator following his adjudication of Mr. Davis's claim. Id. Even assuming *arguendo* that *Locurto* is controlling, there is an issue of fact as to the sufficiency of the post-deprivation hearing, and the record

requires further development. Even if the arbitrator was at the top of his game, arbitration and an Article 78 hearing in state court before an actual judge are far from commensurate.

Elsewhere, the Second Circuit has made clear that: "'The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.' Even the most minimal guarantees of procedural due process require that the decision be issued by 'a neutral and detached hearing body such as a traditional parole board' and support by at least 'some evidence.' Indeed, 'the essence of a fair hearing is an impartial decisionmaker'". *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citations omitted). This Court should not grant its imprimatur to a notion of due process that requires only a show trial for the purposes of providing a veneer of the rule of law.

## Blocking the Opportunity to Cross-Examine Witnesses is a Fundamental Violation of Due Process

Documents produced in discovery revealed that Defendants blocked Mr. Davis's representatives from cross-examining the crew of the train his collided-with in order to solicit testimony that they spoke to Mr. Davis after the incident and informed him that they had called the incident in, mitigating any charge that Mr. Davis failed to report the incident because he was engaged in some sort of cover-up. The statements of the witnesses Mr. Davis's representative intended to call were entered into the record, subjecting the witnesses to cross-examination,

but Metro North Vice President Andrew Paul blocked these witnesses from being subject to cross-examination at the second day of the hearing. A97. The right to cross-examine witnesses whose testimony is being used against you is a fundamental due process violation that could not be cured by a post-deprivation hearing limited to the (tainted) evidence adduced at the underlying hearing. *See e.g. Townley v. Heckler*, 748 F.2d 109 (2d Cir. 1984); *Gullo v. Califano*, 609 F.2d 649 (2d Cir. 1979). Judge Ramos simply ignored this argument in his decision.

Indeed, Deposition testimony developed in discovery (post-briefing on Defendants' motion) further establishes the salience of the testimony these witnesses would provide, as the individual who made the ultimate decision to fire Mr. Davis made clear he was motivated to do so, in part, by his belief that Mr. Davis had engaged in a "cover-up". Because Judge Ramos declined to convert the motion into one for summary judgement and hold it in abeyance pending the completion of discovery, Mr. Davis was deprived of the opportunity to put such evidence into the record.

## Selective Enforcement

To state a viable claim under a selective enforcement theory, a plaintiff must show that: (1) a plaintiff was treated differently from other similarly situated employees and; (2) such treatment was motivated by the malicious or bad-faith intent to injure a person. *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790

(2d Cir. 2007). The test of a malice-based claim requires proof that the disparate treatment was caused by the impermissible motivation. *Bizzaro v. Miranda*, 394 F.3d. 82, 87 (2d Cir. 2005).

To prove disparate treatment via comparators, a plaintiff must show that he and his comparators are similarly situated in all material respects. *Artec Constr. & Dev. Corp. v. City of New York*, No. 15 Civ. 9494 (KPF), 2017 WL 5891817, at *10 (S.D.N.Y. Nov. 28, 2017). Similarly situated does not mean identical but rather "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). The resemblance test relies on an objective standard. *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y 2011). The test is satisfied when a plaintiff provides comparators a prudent person would objectively find to be roughly equivalent with the plaintiff. *Id.* "'[R]elevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004) (quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989)).

At the pleading stage, a plaintiff is not required to proffer evidence of identicality of the comparators, but need only allege sufficient facts for the court to determine whether it is plausible that a trier of fact could determine that the alleged comparators are similarly situated and were treated differently. *Rosario v. Town of Mount Kisco*, No. 16 Civ. 8766 (NSR), 2018 WL 2209487, at *7 (S.D.N.Y. May 11, 2018).

### Facially Disparate Treatment Establishes Selective Enforcement

<u>Defendants Offered a Waiver to the Engineer Who Took Full Responsibility, While Refusing to Even Hold the Mandatory Pre-Trial Conciliation Meeting With Mr. Davis's Representatives</u>

In ruling on Defendants' first motion to dismiss, Judge Ramos concluded that the engineer who caused the 2018 collision and took full responsibility for it was not a proper comparator because: "the engineer admitted guilt prior to the commencement of disciplinary hearings while Davis did not." Docket Entry No. 52, P. 17. Judge Ramos granted plaintiff leave to replead this cause of action, and Mr. Davis did so, with aplomb.

Defendants did not provide Mr. Davis with an opportunity to plead guilty prior to the commencement of disciplinary hearings because they unilaterally cancelled the mandatory pre-trial conciliation meeting with Mr. Davis's representatives, in violation of the Collective Bargaining Agreement. SAC ¶ 38-43, A20-21. Defendants held such conciliation meetings with the engineer and

brakeman pre-hearing, and offered them settlements, which they accepted. Id. ¶ 41-42. Mr. Davis, on the other hand, was not actually provided with an opportunity to admit guilt and take a waiver, even post-investigation. Id. ¶ 45-46. While Defendants dispute whether Mr. Davis was given an opportunity to admit guilt and take a waiver post-hearing, they do not dispute that he was not provided with such an opportunity pre-hearing, unlike his co-workers, including the engineer who took full responsibility for the collision.

In the immediate aftermath of the collision, Defendants' Director of Employee & Labor Relations opined that: "It does sound like we have three terminations on our hands", in reference to the engineer who was operating the train, Mr. Davis, and the brakeman. A84. The following week, Vice President Andrew Paul wrote that the engineer and Mr. Davis would likely be terminated due to some "serious disciplinary marks on their record". A89. But as time went by, the engineer's disciplinary record was recharacterized as "fine since a physical dispute with a fellow engineer about 10 years back", leading to a mere suspension for the engineer, while Defendants decided to put Mr. Davis's hearing on a "fast track" with "an eye towards termination". A91.

Except that the engineer decidedly did not have a clean record since getting into a fistfight with a colleague "10 years back". On the contrary, he received a 3-day suspension in 2014, followed by a Formal Reprimand the same year. A94.

Save for a 2016 incident – which remains in dispute in fact, but the details of which are not relevant here – Mr. Davis otherwise had a sterling record over a 25-year career.

The CBA requires an investigation of charges brought against an employee within seven days of when the employee receives notice of the investigation. But no investigation was conducted as to the charges against Mr. Davis for more than a month-and-a-half. When the union representative for Metro North conductors caught wind that the investigation had not been conducted within the relevant timeframe, he opined: "'Heard they didn't have your investigation. They want to get you". SAC ¶ 32-34, A19. After Mr. Davis was suspended without pay, he posted a picture of himself on a boat on social media, which Defendants caught wind of and characterized as a "huge middle finger". Id. ¶ 37. Defendants singled-out Mr. Davis for termination before the underlying facts had been determined. SAC ¶ 31, A18; *see also* A91. These facts, particularly at the pleading stage, are more than sufficient for the trier of fact to infer malicious motivation.

<u>Defendants Treated Other Employees Involved in Collisions<br>Much More Leniently than Mr. Davis</u>

"[O]n December 17, 2014, an engine ran a signal in grand central, and collided with a passenger train with passengers aboard. Defendants consider a collision with a passenger train with passengers on board a more severe incident than a collision with a non-passenger train and/or a collision with a train with no

passengers on board". SAC ¶ 48, A22. Defendants did not seek to terminate the engineer responsible for the collision, Danielle Bonge, and did not even bring the conductor – Dan Magro – up on any charges at all. Id. ¶ 48-51. Judge Ramos distinguished Danielle Bonge by asserting that she took a waiver, but again, Mr. Davis was never offered a waiver because Defendants unilaterally cancelled the mandatory pre-trial conciliation meeting.

In a footnote, Judge Ramos held that Dan Magro is not similarly situated because Mr. Davis: "fails to offer evidence to state the employees' previous disciplinary history, the extent of their culpability in regard to the collision, and whether Defendants performed the same unauthorized actions that Davis did. *Id.* For example, there is no evidence that either employee failed to carry their conductor license or performed an unauthorized reverse move." A116 fn. 8. This turns the caselaw cited by Judge Ramos himself on its head; instead of requiring that comparators be "roughly equivalent" - *Mosdos Chofetz, supra* - they must have engaged in exactly the same conduct. Nor is there any way for Mr. Davis to have plead such minutiae; how could Mr. Davis possibly know Mr. Magro's disciplinary history pre-discovery? As argued below, Defendants themselves have no idea if Mr. Magro failed to carry his conductor license or performed an unauthorized reverse move, because they never brought him up on charges in the first place, and no trial was held to determine such facts. The fact that a fellow

conductor was not even brought up on charges for failing to stop his train from colliding with a passenger train while Mr. Davis was brought up on charges for failing to stop his train from colliding with an empty train because his line of sight was obscured is more than sufficient to demonstrate disparate treatment at the pleading stage.

Defendants' Treatment of Other Conductors
Demonstrates Disproportional Discipline

In addition to being treated with kid gloves when she caused a collision with a passenger train at Grand Central, Danielle Bonge was allowed to remain a conductor at Metro North despite being criminally charged for her involvement in a cheating conspiracy on Metro North technical exams while on probation. Indeed, while Mr. Davis was fired for violations while on a last chance waiver, Danielle Bonge was actually given not one, nor two, but three last chance waivers, and at no point did Metro North seek to terminate her employment entirely. Accordingly, whether she accepted a waiver or not is a canard, as the alternative to her accepting a waiver was not termination. SAC ¶ 48-50, A22-3.

Mr. Davis also identified a slew of other (white) conductors who engaged in severe misconduct while on a "last chance" waiver but were not fired.

Tom Dunne, a conductor, received a last chance waiver for stealing from Rite Aide while on duty and being arrested for shoplifting. He then received another "last chance" waiver after being caught on camera making a reverse move

in White Plains with a conductor rather than the engineer - the person who is supposed to be operating the train – which Defendants consider a violation of greater severity than the reverse move Mr. Davis was charged with. SAC ¶ 54, A24. Judge Ramos characterized this allegation as "conclusory" and disregarded it, writing: "In fact, there is no evidence that a post-collision unauthorized reversal is of the same seriousness as an unauthorized reversal that is conducted unrelated to a collision." A116-7. Except that Mr. Davis did not plead that Tom Dunne's reversal was unrelated to a collision, and Mr. Davis is not required to have psychic powers and pre-emptively plead additional facts to undermine any potential distinction that could be drawn between the circumstances.

Ironically, Judge Ramos ruled that Dan Magro is not a similarly situated comparator because Mr. Davis had not alleged he engaged in an unauthorized reverse move, and then simultaneously held that Mr. Davis's allegation that Tom Dunne engaged in an unauthorized reverse move but was not treated as severely as Mr. Davis was "conclusory". Judge Ramos clearly applied a standard of perfect identicality, rather than rough equivalence between comparators.

Conductor Michael Duffy violated a last chance waiver by testing positive for an illegal substance but was brought back to work instead of terminated. Mr. Davis plead that Defendants consider the presence of an illegal substance in an employee's blood an offense or more severe than operating a train too fast or

failing to prevent a collision because intoxication on illegal substances while operating a train is knowingly and intentionally reckless. SAC ¶ 55, A24. J. Ramos held that this allegation was conclusory, and therefore entitled to no weight. But Mr. Davis did not assert merely that Defendants consider this a commensurate offense, but explained *why* Defendants consider it so. It is unclear how such a pleading could be considered "conclusory", or what more Mr. Davis could possible plead pre-discovery.

### Title VII

In employment discrimination matters, where intent and state of mind are in dispute, even "summary judgment is ordinarily inappropriate." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). "An extra measure of caution is merited…in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001). The prima facie burden in a discrimination suit is "not onerous". *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

To establish a prima facie case of discrimination under Title VII, a plaintiff must show that: 1) they are a member of a protected class; 2) they are qualified for the position held; 3) they suffered an adverse employment action; 4) the adverse employment action occurred under circumstances giving rise to an inference of

discrimination. *Stratton v. Dep't for the Aging for N.Y.C.*, 132 F.3d 869, 878 (2d Cir. 1997). Only the fourth element is in dispute.

Defendants' Deviation from Procedural Regularity
Creates an Inference of Discrimination

In this matter, Defendants did not discipline and terminate Mr. Davis in the ordinary course of business. On the contrary, they decided to fire Mr. Davis before an investigation was even conducted and engaged in facial violations of the process required by the applicable Collective Bargaining Agreement.

Such deviations from procedural regularity create an inference of discrimination. *Stern v. Trustees of Columbia University in City of New York*, 131 F.3d 305, 313 (2d Cir. 1997); *see also Sklaver v. Casso-Solar Corp.*, No. 02-CV-9928, 2004 WL 1381264 *9 (S.D.N.Y. 2004); *Almodovar v. Cross Fin. Corp.*, No. 20-CV-01179, 2022 U.S. Dist. Lexis 98413 *36-37 (D. Conn. June 2, 2022) (denying summary judgment and finding that the employer's failure to follow internal policies was one (of multiple) pieces of "strong circumstantial evidence" from which the jury could conclude the employer's real motivation was discrimination). Indeed, Metro North itself had a motion for summary judgment denied because its departure from procedural regularity created an issue of material fact as to whether a factfinder could infer discriminatory intent in another matter. *Norris v. Metro North Commuter R.R. Co.*, 522 F.Supp.2d 402, 409 (D. Conn. 2007).

As to this argument, Judge Ramos held that: "Davis' allegations do not make out a *prima facie* case of discrimination, but rather corroborate the Defendants' alleged pretextual motivations for terminating his employment" citing to *Norris*, *supra*. A118. This holding turns the caselaw on its head: Deviation from procedural regularity, instead of permitting the inference of discriminatory motivation undermines it, by demonstrating the seriousness with which Defendants took the alleged offense. By this logic, Defendants could have fired Mr. Davis without holding a hearing at all, and this would strengthen their legal defense!

To the extent J. Ramos was taking the more modest position that deviation from procedural regularity is only relevant to pretext and cannot support the permissible inference of discrimination necessary to state a prima facie case without citation, this is simply wrong on the law. *See e.g. Johnson v. Connecticut*, 798 F.Supp.2d 379, 389 (D. Conn. 2011) ("When an employer disregards guidelines, it can provide 'evidence of pretext and discriminatory intent'") *citing Richards v. N.Y.C. Bd. Of Educ.*, 668 F.Supp. 259, 266 (S.D.N.Y. 1987); *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, No. 08 Civ. 11031, 2011 U.S. Dist. Lexis 172790 (S.D.N.Y. March 30, 2011) ("An inconsistent application of normal procedures within an organization may give rise to an inference of discrimination"), *citing Zahorik v. Cornell University*, 729 F.2d 85, 93 (2d Cir. 1984); *Richard v. Calvet*, No. 99 Civ. 12172, 2005 U.S. Dist. Lexis 5365 at *25

(S.D.N.Y. Mar. 31, 2005) (procedural deviations may lead a finder of fact to infer

that the employer was "dissembling to cover up a discriminatory purpose");

*Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.*, No. 02 Civ. 9151, 2008

U.S. Dist. Lexis 58040 (S.D.N.Y. July 31, 2008) ("A jury could reasonably find

pretext *and* discriminatory motivation based on these procedural deviations")

(emphasis added).

Here, Defendants did not merely violate a solitary technicality that can be

overlooked. Defendants determined that they would fire Ms. Davis before the

investigation was even conducted, delayed the investigation for 6+ multiples of the

time-period within which it was required to be conducted - creating the opportunity

for Defendants to develop the rationale to fire Mr. Davis – and refused to hold a

mandatory pre-investigation conciliation meeting. In layman's terms, Defendants

decided to jam Mr. Davis up, and they must bear the consequences.

<u>Terminating a Loyal Employee's 25-year Career</u>
<u>for a Collision A Co-worker Took Responsibility For</u>
<u>Is Wildly Disproportionate Punishment</u>

Following the train collision at issue, Defendants' New Haven Line

Superintendent, Mike Donnarumma, circulated an email to set up two

investigations related to the collision at issue: 1) "Improper Initial Terminal Brake

Test" and; 2) "Violation of Restricted Speed". A86. The first investigation was

essentially accusing the train crew of failing to perform a mandatory brake test

before taking the train out for a spin. As the facts came out, it became clear that Mr. Davis and the rest of the train crew had properly performed the brake test, and this allegation was utterly abandoned. And yet, Defendants did not revise their determination to fire Mr. Davis.

As referenced above, it was the engineer, not Mr. Davis, who actually operated the train (and took full responsibility for the collision). Accordingly, when Defendants drafted charges against the train crew, there was only a single charge that could be brought against Mr. Davis alone: failure to carry his conductor certification card on his person. A87.

Mr. Davis's union ultimately went to arbitration on Mr. Davis's behalf. The arbitrator decided that while Mr. Davis's representatives may have been able to establish that the collision itself was solely the fault of the engineer; that the unhitching of the trains was not an illegal reverse move; that Mr. Davis had not failed to report the incident because it had already been called in; or that Mr. Davis's failure to have his conductor certification card on his person at the time of the collision was not intentional or related to the collision, because Mr. Davis was already on a "last chance" waiver from the 2016 incident: "Even that failure to have the required certificate on him as he worked evidences disregard for the Carrier's requirements" and justified his termination. A80. The arbitrator's ruling puts in stark relief the hyper technical compliance ostensibly required of Mr.

Davis, and the seriousness with which Defendants take their own rules and obligations.

As discussed above, Defendants introduced statements of crew of the train that Mr. Davis's train collided with into the record, and Mr. Davis's representatives sought to call those witnesses at the investigation to demonstrate that they had already called the incident in and had relayed that information to Mr. Davis as to the charge that Mr. Davis failed to report the incident. In response, Andrew Paul wrote that: "The question at the hearing is whether Mr. Davis took any action to notify the RTC or supervision of the collision, as required by rule. Having a conversation with the crew of Train #1924 is not at all relevant to that inquiry." A97. Of course, if the initial belief as described above was that there was some sort of cover-up, then testimony that Mr. Davis knew the incident had already been called-in from the individual who reported it would be highly probative. Regardless, such information would certainly be relevant in mitigation of the seriousness of the offense. That Defendants acted to block these witnesses from testifying, focusing on the technicality of whether Mr. Davis himself called the incident in rather than whether the incident had been called in at all and Mr. Davis knew it, shows that Defendants were seeking to fire Mr. Davis by any means necessary – even the thinnest of technicalities – instead of following the facts where they led. Such a disingenuous overreaction to justify termination of a

longstanding employee does not merely create an inference of discrimination, it is sufficient to establish pretext and defeat a motion for summary judgment. *Smith v. North Shore*, 286 F.Supp.3d 501, 519 (E.D.N.Y. 2018); *see Stalter v. Walmart Stores*, 195 F.3d 285, 290 (7th Cir. 1999).

Judge Ramos held that this allegation goes to pretext, not the prima facie case, and that a prima facie case can only be established by direct evidence, temporal proximity, or comparator evidence, which is a clear misstatement of the law. The citation to and discussion of temporal proximity is particularly troubling because this is a discrimination claim rather than a retaliation claim, and the language utilized by J. Ramos on this point is incoherent: "First, Davis did not sufficiently state a claim that his termination followed closely with Metro-North's discriminatory decision to fire him since there were other, non-discriminatory reasons for his termination." A118-9. The slapdash decision below must be overturned.

## <u>CONCLUSION</u>

For the reasons outlined above, the District Court's decision Ordering dismissal of the Second Amended Complaint for failure to state a claim should be reversed and remanded.

Dated: September 29, 2023

Josh Bernstein, P.C.
*Counsel for Plaintiff*

By:_____/s/_____
Joshua Alexander Bernstein
188 Grand St., 2nd Fl.
New York, NY 10013
(646) 308-1515
jbernstein@jbernsteinpc.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 31(a)</u>

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,476 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional-spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 29, 2023

Josh Bernstein, P.C.
*Counsel for Plaintiffs*

By:_____/s/_____
Joshua Alexander Bernstein
188 Grand St., 2nd Fl.
New York, NY 10013
(646) 308-1515
jbernstein@jbernsteinpc.com